The last case this morning is 413-0433, Hupp v. Rosales, show appearance of the appellant Brittany Kink, Twigo? Twigo! Yeah, Kink would be fine if that's what you said. Well, now I will try to make it correct. Twigo. Twigo. Okay, and for the appellee, Mr. Scott. Ms. Twigo, you may proceed. May it please the Court, Counsel. Counsel. My name is Brittany Kink, Twigo, and I represent the respondent appellant, Maria Rosales, and we're here today, Your Honors, because the justice system has utterly failed Ms. Rosales, and more importantly, her daughter. The trial court seemed to look at, not look at what was in the best interest of the child, but more what was in the best interest of the parents, and more particularly Mr. Hupp. So I'll be addressing three issues, the award of joint custody to the parties, naming Mr. Hupp as primary custodian, the rotating visitation schedule, as well as the deviation from child support. In making its determination with regard to custody, the trial court found that all of the 602 factors were either equal or not applicable with the exception of the third factor, the interrelationship and interaction between the child and her parents or anyone else who may significantly affect the child. And what I'm wondering, Your Honors, is how this is even possible. What the trial courts say, and case law is clear, that this factor goes towards the primary caretaker, and it's premised on stability and continuity, which is the absence of change. And there's no stability and no continuity in an order that, where there's been a temporary custody order with one parent for a year, with exclusive custody with that parent for six months prior to that, and then all of a sudden flipping that schedule to something completely opposite of what it was, and saying that stability and continuity can still be achieved just because of the child's young age, and I don't see how this is possible. Because what the court is essentially saying is that there's no best interest standard of a child that's a year and a half, that she hasn't created a bond with this mother that she's been with for the last year and a half, that she hasn't become used to and accustomed to the schedule that she's in right now with her mother. And further, if you look at the testimony, I mean, Maria's been in charge of medical care, she's attended every appointment, she's taken the child to haircuts, taken care of her when she's sick, her family's been around since the very beginning, her parents, who she's lived with since the child was born and the child has lived with as well, they've seen her on a daily basis. And to completely take that away from her is, it's not what the court meant when it was talking about interaction and interrelationship, if you're just switching that around. And that spills over into the fourth factor, which is the child's adjustment to home, school, and community, where the courts say that there's no denying a clear environmental factor develops when a child is in a primary caregiver's care for a lengthy period of time, even if it is just a custody order. And they say this is especially true when the child has developed remarkably well, and that's exactly what's going on here. This child, all the testimony states, this child is so smart, she's so well-behaved. It's because of everything, it's because of her environment with her mother. And Ms. Hupp, Mr. Hupp's mother even said that Maria must be doing something right because my granddaughter is incredibly happy, and she must be doing something right because Aubrey is so well-behaved. She is giving credence to my client, essentially saying that it is my client who has done this great job with this child. You argue in your brief that sex is a relevant factor to be used by the courts in custody determinations. Do you cite no authority for that? That's correct, Your Honor, and it can be considered as a factor. I'm not saying that it's a basis for any type of reversal, but I don't think that the court considered that even. How old is the child? She will be two in November. Isn't this an assertion of the Tender Years Doctrine by you and your half-wit mother? No, Your Honor. Which, by the way, has been explicitly rejected by the courts of the state of Illinois. I think the Equal Rights Amendment of our 1970 Constitution was cited as the source of saying that courts can't consider the sex of parents in deciding custody issues, which may account for why you cite no authority for your claim in the brief. I agree that the Tender Years Doctrine has been done away with. However, there are courts, one actually was cited by counsel, the RQA, I apologize, I'm not sure how that's pronounced, but it does say that children derive substantial benefits from the close personal relationship with the same-sex parent to whom they look for a model. I'm not trying to say that because the child's young that she should be with the mother. I'm just saying that the mother seems to acknowledge that she's not a boy. She doesn't want to sit and watch sports with him on a Sunday, watch football every day, although I realize that maybe she will when she gets older. But as a young girl, she needs to be active and doing more appropriate things and have a role model like her mother to look to. And that's more of where I was getting into the sex, Your Honor. And another factor that would require reversal is the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. The testimony shows that Marie has undoubtedly done this. She has the willingness, has the ability. She's encouraged non-court ordered visitation. She has allowed Mr. Hub to make up missed visitations when he's completely forgot or overslept, didn't know what day it was. All these things that were his fault, she changed her schedule to allow him to see the child. Your client is an illegal alien? I'm sorry? Your client is an illegal alien? Is that a trick question? What? She was when she came to the United States. Counsel, is she a United States citizen? No, with some qualifications. Isn't, aren't you a citizen or not? Isn't that a yes or no answer? Yes. Okay, so she's not a citizen. She's not. She is. She's here on a deferred action. On a what? Deferred action. What does that mean? It's something that was passed by President Obama back last fall, I believe. So she's an illegal alien against whom efforts to deport her will not be taken at this time? That's correct. So the answer to my earlier question is yes. I suppose. Well, you know, excuse me for just pause for a moment. Sure. We're in the precision of analysis business here. Right. The precision of language business. And it's important for you to, at least for this exercise of oral arguments, join us in that effort. Okay. Sure. So she's an illegal alien. To the extent that she doesn't have a visa, that's correct. So I guess that's a yes? Yes. And it's your position that under her current situation, there's no reason to believe that the United States government will be seeking to deport her? Correct. To what extent is this status of hers, as the record shows her, a factor that the trial court did consider and should consider? The trial court seems to indicate in its order that it did consider it. But based on all of the information that was given to her, that she didn't think it was an issue. And, Your Honor, I don't believe it's an issue either. She is here on this deferred action. The only way she can be deported is if she commits some felonious action, which that seems to be the case with even Mr. Huff, where he could kill someone in a car accident and have to go to jail, and it would have the same effect. He's not going to be deported. Right. But if he went to jail, it would essentially have the same effect on the trial. The child was born in this country? Yes, she was. So it is your position that the status of the mother as an illegal alien wasn't a problem as far as the trial judge is concerned? That's correct. Go ahead. And another factor, I would say that's an independent basis for reversal, is Mr. Huff's marijuana use. He states in his brief that using marijuana one time wasn't enough. In fact, the Ortel Court states that it is. And even if he has stopped, the Ortel Court also cites two other Illinois cases where it says past alcohol abuse, even if there was evidence and testimony that the party had seized the dangerous behavior, that it was still enough. So, Your Honors, I would say that I know there's conflicting testimony on whether the marijuana use, whether he was actually high once he got home to care for his child. I would say that almost doesn't matter. He smoked marijuana the same evening he knew he was going to come home and care for his child. That just shows his decision-making ability right there and that he's caring more about himself than his child. Prior to the trial court's order in this case, how long had the child lived with the mother? A year and a half. And she had, this was up in the Aurora area? Westchester. Westchester. Yes. And the father was still living here in St. Louis County? The father lived with Maria and her daughter for the first, about six to eight weeks of her life in Westchester and then moved back to Springfield. Okay. So, during that period of time, he's had visitation with the child? He didn't receive visitation until, I believe, February of 2012. And it wasn't on a regular basis until April of 2012. When was the trial court order entered? The temporary one or? Well, the temporary one said what? The temporary one was on April 20th of 2012 and it stated that Mr. Hupp would have every other weekend from Thursday at 5 p.m. to Sunday at 5 p.m. and then every other Wednesday from 3 p.m. to 5 p.m. on Thursday. And the permanent order? The parties would have a week-on, week-off visitation schedule. They would switch on Sundays. And once the child reached school age, the order would flip and just give Ms. Rosales every other weekend. When was that, Emily? April 24th of 2013. And, Your Honors, I guess we can move into the alternating and rotating visitation schedule as well as joint custody. I don't think joint custody is appropriate in this matter, and particularly the Fourth District has expressed its disfavor of these unless the parties can show an unusual ability to cooperate. These two, they can't decide whether they've made agreements or not. They can't decide, I can't even imagine they would be able to decide whether I was a male or a female. That's how different these two are, and they obviously haven't shown an ability to work together. Counsel stated in his brief multiple times that we've had to come back to court or attorneys have to be called for different issues. This is pretty much showing that these two cannot get along. And also the geographic distance between the parties doesn't lend itself to a joint custody order. The parties, I mean there's no way that there's going to be a merry-go-round of health care providers and playmates and environments. These two have completely conflicting environments, and that goes into the alternating and rotating visitation schedule where this child lives a different life from week to week, and that is not appropriate for a young child. And further, the joint custody orders are meant to maximize the involvement of both the parents and the child's life, and this doesn't do that at all. In fact, it gives Mr. Huff unbridled decision-making power where he can make any decision he wants as long as he doesn't unreasonably disregard Ms. Rosales' opinion, which it's always going to be his. And this is unfitting, especially since he hasn't even attended all the doctor's appointments, hasn't been involved in her medical care. It just doesn't seem fitting. And moving into the alternating and rotating visitation schedules, the Fourth District has consistently viewed these with disfavor, particularly with young children, because it doesn't provide a permanent existence for the child. And they say they're highly disfavored unless the child is old enough to cope with these type of arrangements, which this child is a year and a half, almost two years old. She's not old enough to understand that I'm going to be with this parent for this long and then another parent for this long and then be able to reconcile those two things and know I'll be going back to my mother who I've been accustomed with. And the Hacker case is particularly on point, where the kids were being rotated week to week and the court reversed it because of the age of the children, which were 3, 5, and 7 at the time, which is exactly what the case is here. A very young child who just can't understand and comprehend this type of schedule. And, Your Honors, I'd like to also address very quickly the deviation from child support. Obviously, Your Honors are well aware that the statutory presumption for one child is 20%, and the Stanley Court said that compelling reasons must exist in order to overcome the presumption to permit the court to deviate from the guidelines. Is Mr. Hupp employed? I'm sorry? Is he employed? No, he's not. And what the courts are wanting, or what the court pointed out as being compelling reasons, is a non-custodial parent's resources are very limited or that the guidelines would create a windfall for the custodial parent. Mr. Hupp's resources are not limited. Although he does not work, he receives substantial gifts from his family, and his father and himself even testified that this is on an as-needed basis. And right now he's living the life of a fully employed adult. And also the guidelines would create a windfall for the custodial parent. This isn't the case here either. Because the example that was given by the court were two doctors that are making substantial income and are financially stable to support the child on their own, and that an award of 20% child support would be $60,000 to $70,000 a year. And the two reasons that the trial court given Mr. Hupp's status as a college student, which isn't based in law, and his independent contributions to the child, but that doesn't make sense either because there was no testimony that he had any more independent contributions to the child than any other non-custodial parent. If we're allowing a deviation based on this, any non-custodial parent would be able to say that they make independent contributions to the child and that therefore there should be a deviation. Was the trial court thinking that because he has a child every week, or every other week, that he's contributing to the support that way? Was that the basis for the deviation? No, this was actually based retroactively on the old schedule when he had her every other weekend. So in closing, Your Honors, we're to look at the best interest of the child. And if that's correct, there's nothing in Aubrey's best interest that is in this order. And I realize the standard of review is a manifest way to the evidence, and most people would see this as an uphill battle. However, Your Honors, the case law and the testimony doesn't make this an uphill battle, but makes a reversal necessary. And we've already seen the emotional effects that being away from Aubrey's mother has caused her. And so, Your Honors, I'm just asking to right the wrong that's been done to this child. Okay. Thank you, Counsel. Thank you. Mr. Scott. May it please the Court. Counsel. Counsel. I don't believe that the standard of the judge's ruling is against the manifest way to the evidence. In fact, I'm a little surprised that Ms. Rosales would actually bring this action since the judge's ruling, I think, gave her benefits or input into custodial management that obviously would not be there in a sole custodial arrangement. If you look at the judge's opinion overall, she made a selection balancing the factors in 602 that she specifically referred to. And in essence said that she believes that the environment that Mr. Huff provides is a better environment. So what did she do? She said, okay, I'm going to carve out a situation where both of these parents interact on major decisions. But I'm also not going to put them in a situation like this Court has dealt with a number of times, which I guess you could call it straight joint custody where, you know, there's constant mediation and then somebody running the Court because they couldn't agree or anything. This judge said, hey, if these people discuss this and he can't ignore this, then what's going to happen is that there's going to be a decision maker. If you step back, you know, Ms. King-Twego said... I got it wrong. Anyway, Twego, I think I got that. She says, well, it in essence gives him sole custody. What it does is it makes a final decision maker. But what do we have here? Is this a joint custody matter? And don't you need a joint parenting agreement? Isn't that what the statute speaks of? Normally, that's true. Normally? But if you read the statute, it actually gives the judge the right to order joint custody absent an agreement. And so it's well worth... How wise, of course, is that, Mr. Scott? Well, you know, personally, if I would have preferred it, she'd have said, sole custody, Mr. Upton, and we wouldn't have this issue. But the issue is, is that does the crafting of the order that she did, did that put this child or did it not serve the child's best interest? What it did do is it keeps mom's input on major decisions. Now, this all ends as far as... I don't want to talk about physical custody time right now. We're still talking about decision making. This keeps mom's input, whereas joint custody... I mean, sole custody, as this court is well aware of, and especially having been on the trial bench, all three of you, I mean, a lot of times, sole custody means that the noncustodial parents, you know, what do you visit on weekends? And, you know, honestly, I don't care what you think. Whereas this enables her to have input in what she thinks is best for the child. It actually, hopefully, will work parents to cooperate a little bit. I think the move in the law today is more towards a co-parenting mentality. I'm not going to comment politically on what has been introduced into the legislature, but the whole concept. It might work if they were both in Springfield or both in Westchester. It's difficult. Yeah, when one's in Westchester and one's in Springfield. That's true. And that makes it more difficult, and I'm not going to discount that. But it doesn't mean that the judge's decision of allowing Maria to have input is wrong. What it does mean is that if you look at the totality of it, this judge chose Mr. Huff's environment, based on the factors, to be the one that is better for Aubrey. So I believe that making it a joint custody with a restriction or an end to the fighting or the end of the mediation is appropriate. What undergirded that finding? Pardon me? What supported that finding? When the child's been living with the mother, the grandparents, extended family, and then filed the action here in Sanguine County, and the court finds based on factor number three. That's right. The facts, I think, that are more apparent in this record are different than just where they've been living in one place versus the other and traveling back and forth. This started out for the first six to eight weeks of the little girl's life, where my client lived in her parents' home. And the testimony is that during the night he spent, he would get up in the night, he'd take care of her and those types of things. They split up at the end of December, early January, and then he filed his action and there were a number of legal proceedings back and forth, moving to dismiss it, moving to transfer. And during that entire time period, she wouldn't let him visit. He drove to Chicago. She said, come up and visit. He drove back. There's a lot of instability in this evidence in the text messages that the court remembers from some of the texting back and forth where she would say, your daughter misses you. Come visit. He'd drive up there. He even one time took his dad. She wouldn't let him visit. She may allow him to see him for an hour or two here, but no visit unless he signed an agreement that says she gets sole custody. When he wouldn't sign that, then we had to come to court and force visitation. Then when we came here, then any change in that visitation, we had to go to court to do. One time, even for extended time, we had to go to court and basically present to the court we want extended time in the summer and then carve out an exception. Did they go to mediation? I don't believe they did. Is it not required in parentage cases? It should have been. But I don't believe it was. But you haven't really answered Justice Bump's question. Namely, this child had been living with her mother and mother's extended family for all this time. I'll concede that there are these visitation problems, but what accounts for taking the child from the only home the child has known and essentially uprooting the child? How is that in the child's best interest? First of all, Judge, I don't think that it's taking the child from the only home that she knows. The testimony is quite extensive as to her interjection and intertwining her with the family of Mr. Huck. She comes here on Thursday to Sunday. She also comes from Wednesday afternoon until Thursday afternoon. Every week she's here for a period of that time period. And with regard to Maria's home, Maria, during the time that she has them, she lives with her parents who work late at night until early afternoon. She, two nights a week, goes to class. So there's a lot of shifting back and forth with this child in each home. But in my client's home, she has become integrated in with the grandparents, with him, with his friends. The testimony is quite strong from the friends that come in, from the family members that come in, and from his brother who even arranges to come home when he has visitation. So she knows the Springfield community. She knows the extended family here. She's been integrated into this family. And at one and a half, which is what she was when the judge looked at this picture, she was saying, with this age of a child, you don't have the normal things like you have in Hacker and all the other ones, where they've been going to school for a while, where they've been at a doctor for a while, where you're going to shift back and forth and those type of things. You have an initial child at an age when there's not these huge, I guess, anchors to that community. What about the impact, though, Mr. Scott, on an 18-month-old child who's waking up one week in one bedroom and the next week in a different bedroom, and the issue of stability for that child? Not to mention the eight hours every week that child's spending on the highway. Well, Your Honor, actually she was spending more time before. She was traveling Wednesday and Thursday before. That's what I'm talking about. And she was traveling Thursday and Sunday before. Now she's traveling once a week, one direction. Well, and then she has to go back the next afternoon. Yeah, but it's much less travel. It's much less time in a car and spending, instead of four days, instead of eight days, it's four. So it's less travel. Every week she's driving between Springfield and Chicago. And she was driving, I apologize. That's all right. She was driving, last time, two times a week, each week, which obviously is difficult when you live in different locales. But you try to fashion something for different interim periods of this child's life. When she gets to preschool age, when she's going to be involved in instruction in a regular class curriculum and when she's going to be developing social interaction with other children and that type of thing, at that point in time, under the judge's ruling, it switches to what you would call a traditional every-other-weekend visitation arrangement. So the question is, is when she allows the mother to have an every-other-week arrangement during these first year-and-a-half period of time, maybe two years, at the outside, depending upon how you slice it, is that bad for this child? As opposed to, starting now, giving her every other week. Because in essence, that's what the court decided is going to happen when the child gets to, for lack of a better term, instructional age. And I don't believe that the evidence supports it's not. She's bonded here. She's bonded to the people that are here. I'm not saying she's not bonded to her mom or not bonded to her grandparents in Chicago, but she is like a lot of kids. They will live in two different worlds. So this judge balanced the two worlds. One of the things that I think was considered, it wasn't controlling, was the fact that the world that her mom lives in is somewhat unstable just because of the situation with her U.S. citizenship. She's here and has the ability to drive now and has the ability not to be deported now because of a presidential declaration. If the next president rescinds that, then she's back in the same type of question, legally, of where she is. To what extent was that an issue for the trial judge? Well, the trial judge did not say that was controlling. And if you look at her, I believe her language is exactly it wasn't a controlling factor. But it has to be integrated to that. And I mention that in my argument. The culture is one of, I don't want to totally diminish it, but they are here under a cloud of secrecy to some extent. They can't be open. Just like my client and his family found out she couldn't go on a trip to the Caribbean because she can't get out of the country because she can't get back. They didn't know that. They just said, look, we have an ability to go on a trip. Why don't you and the baby come? And it became a big problem. Simple things like that. You know, for a while she couldn't drive legally. Now she can. Her father drove. Claims on a permit. I don't know how under the vehicle code. But he doesn't have legally the right to drive. Yet he drives a number of times before she gets her license to the exchange. It's just a cultural way of life of not owning up to the fact that they can't function like U.S. citizens. Now, they applied. They didn't apply to O3. She is a part of their application. So I think, Your Honors, that that has to go into the stability of overall what's happening in that environment. Hopefully it won't be a problem. But it could be. And a change in administrations could cause a problem. A change in Washington could cause a problem. Well, what would be the effect? The effect might be uprooting the child, which essentially already happened. What? Changing the domicile. I don't know if it's uprooting the child. The child would be more, you know, would be staying with my client under the current situation if it changed and she was asked to leave the country. My client would still have custody of the child. There had been extensive visitation with the child's domicile where she had been spending most of her time was up in Westchester, wasn't it? Well, yeah, but for a period of 12 months, yeah. What about 12 months? The time period we're talking about is 12 months. Yes. Oh, 15 months, I think the court referenced. But, you know, that is not like the cases that extend for 4 years and 2 1⁄2 years and that type of situation. And I think there's a big difference. Smaller age or younger age child, length of time this has been pending. Percentage of her life, then. I agree with you, Judge. Percentage of her lifetime, but that lifetime is the first year and a half of her life during a period of time that she's spending a significant amount of time with my client. And so I don't think that, you know, this lady, little lady, I'm sorry, has learned both places. And there's tremendous testimony as to her interaction and her development of relationships here and her demeanor here and her ability to have a very good environment here and the ties she has here. She has ties both places. Who came up with the week-to-week alternative here? My client proposed that at the trial. And it's designed to keep both involved until she becomes of school age. Then what? Or the alternate weekend. Would she be living with your client? That's what the court order is, yes, Your Honor. And that is a methodology of allowing the mother to stay on a more regular basis involved with her. There's no psychological evidence or any other evidence that would prove that's not wholesome for this child or good for this child at the present time. And my suggestion to the court is I don't think... You're talking about in this particular case, but that's studies in general. Your Honor, studies in general, I have, you know, studies in general, I think that there were studies 20 years ago that would say no. I think that there are more or lesser standards and lesser opinions now, at least from the courses that I've taken. I'm not a psychologist and don't intend to try and be one or to represent exactly how a psychologist or a custodial evaluator would present an opinion here. But we don't have that in evidence. What is the evidence in this record that would support the finding that the child has a warmer and a healthier interpersonal relationship with Jacob and his family than with Marie and her family? I would say it's a testimony of not only his parents, who see her every time she visits, but also his brother, his friend Colleen Cochran, his friend Rachel Cadwell. They are people that see her on a regular basis, see him interact with her, see the events that they do here, see the interaction between him, his daughter, her, the community. They go to family functions together. They all testify? Yes. The only testimony on behalf of Ms. Rosales was her father and Ms. Rosales. So to some extent, the court has a testimony of a parent, limited testimony of a father versus several people from different angles and different viewpoints observing the interaction of the child with the father. And I think that supports the court's determination. I think the week on, week off schedule is not a death knell like counsel suggests. I think what it does, it enables significant time for both parents. I believe that it is in the child's best interest that the court affirm this situation for these people and this little girl. Is the issue of visitation before us, that is, this weekend, or as Justice Pope says, driving back and forth from Chicago suburbs to Springfield on a weekly basis for a year-and-a-half-old child? Well, I guess it's before you because of the rotational schedule that they're objecting to. In every one of these situations,  you travel every three weeks. I've had judges every two weeks. I've had some judges do every week. One thing I do want to mention, I don't want to not answer your question, Justice, but the child support, I want to just mention that I don't think anybody has extended Rogers to be gifts paying for college expenses. And I think that's our cross-appeal. I don't believe that that is a correct extension. And I don't think that the numbers used are correct. And I've outlined that in my written arguments. They include numbers that are not supportable by the record. But more importantly is the concept that if a parent pays for college education, which this father feels he owes his children, he pays for all of his children, that that is a basis for assessment of child support. In essence, what the court did here is it looked at after the fact and said you paid this much for college, so I'm going to say this is how much you pay for support for a period of time when support has already been paid between both parties for this child during this interim. I don't think that's appropriate. Rogers dealt with a situation, as this Court well knows, $46,000 a year in gifts. The Anderson case came along after that. Thousands of dollars in gifts, actual cash that allowed them to build up a wealth. And that's part of what the Supreme Court said in Rogers was it allows a person an accumulation of wealth. Well, paying for college expenses, tuition and books, fees, giving him food money, and a house to live in does not allow for accumulation of wealth, which would go into the concept that Rogers is attempting to address as far as that income, child support. And I think that extension was wrong. Does your client work for his father? No. Did he at some point? No, what he does is he goes in. His father runs a computer. I'll answer your question. Go ahead, please. His father runs a computer business, and what my client knew from school couldn't be used by the dad in his business. He runs some errands for him. He'll run checks here or there. He will do some little light chores around his office. But what he primarily does is go in and talk to the programmers and learn information that he can in turn use in his classes. But there's nothing he could do that would be marketable or make money for his dad. So, no, he doesn't work for him. It never happens. Okay. Thank you, Mr. Scott. Ms. Twiga? Your Honors, I'd like to touch briefly on the child support issue. And I agree with you in terms of whether he does or does not work for his father. Light chores, running errands, that's what we call a courier at our office. But I don't know. Perhaps it's different. And so I would propose that argument, that he does work. But if not, the Rogers Court does support these gifts that he's receiving as income because it even says, the value of goods and services received by an individual in a given period of time. That's exactly what he is receiving from his father. It doesn't matter how he's using it. Isn't his father paying the tuition directly to the college? If you look at his bank records, for one occasion it shows about $1,000 coming out as perhaps a tuition payment. But it seems like before when he went up in Chicago to school, his dad was paying directly. So it's kind of iffy whether he is receiving, whether his father is paying that directly or whether he is paying it. And regardless of that, he is having the money put into his account, roughly $1,200 a month to spend on whatever he pleases. And this can be an accumulation of wealth if he doesn't spend it on going out to eat all the time or to the movies or whatever the case may be. And your honors, the legislature actually addressed this when it talked about that it allows deductions for expenditures for repayment of debt that represent reasonable and necessary expenses for the production of income. This is not a debt. He's never having to pay back his father. And it's just not what the courts were, or what the legislature was considering when it was talking about, when it was considering this deduction. And also, your honors, in terms of the custodial arrangement, I know Mr. Scott wasn't sure. They did go to mediation. It didn't work. They couldn't agree on any issues.  They can't agree. And he talks about the simulation and how the child is now accustomed to her life in Springfield. What the testimony of the parties was is that they see her on a very infrequent basis. The friends, the family, the brother of Mr. Hubb comes home once a month. He sees Mr. Hubb with the child once a month. The friends about every other weekend. I mean, it's not... Well, you heard my question to Mr. Scott about the interpersonal relationship between the child and Jacob and his family and the number of people who testified about the nature of that relationship. What's the... Was he correct first in his description of that testimony? I would agree that there were about six or seven witnesses, but, your honors, I would say that they didn't really say anything. Obviously, they're going to say, oh, they have a great relationship, but it wasn't anything notable. And these people, they say, the parents, we try to see the child when she's home. The brother, I try to get home when she's there. We all try to do things. I try to work out every day. I don't. I mean, it's not... Their testimony didn't mean anything. They're saying what they try to do. When the child is in Springfield, with whom does she live? Mr. Hubb, but I would argue that a significant amount of that time may be spent outside of Mr. Hubb's care. With whom? The parents. Is that bad? Considering his decision-making abilities, probably not. Doesn't that bespeak of a strong interpersonal relationship with the grandparents? Yes, but... Yes, it would. And I don't deny that they probably have a good relationship, but what is that compared to a relationship that's been every day since the child was born with the exception of the eight days of visitation a month that Mr. Hubb is arguing for? Anything else? No, Your Honor. Okay. I thank this member of the advisory committee for your resourceful testimony. Thank you.